IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:17-cr-50 |
| MICHAEL QUEEN | ) | |
| | ) | |
| Defendant. | ) | |

POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING FACTORS

In accordance with Section 6A1.2 of the *Sentencing Guidelines* and this Court's policy regarding guideline sentencing, the government hereby represents that it has reviewed the Probation Office's presentence report and that it does not dispute any of the factors or facts set out therein. The sentencing guidelines range is 210 to 262 months. However, the statutory maximum for the crimes is 156 months. Therefore, the guideline sentence is accurately calculated at 156 months.

A significant sentence is necessary to reflect the nature and circumstances of the offense, to provide adequate deterrence, and to promote respect for the law. In this case, Haris Qamar's attempted travel was completely unknown to the FBI at the time he tried to travel, and the full extent of Qamar's attempt to join ISIS is still unknown. Michael Queen and Soufian Amri knew about Qamar's intended travel, but they lied to the FBI about it, and then boasted about it later. Amri and Queen claim to believe that Qamar wouldn't have really gone through with joining ISIS. Yet Qamar's attempts to fund ISIS through gift cards and to provide ISIS with photos for a

propaganda video advocating lone-wolf attacks demonstrate the depth of Qamar's conviction and the significance of Amri and Queen's lies.

In accordance with the above—as well as the calculations of the PSR—the Court should sentence the defendant to a significant prison sentence.

Facts

Starting in 2014, ISIS's messaging promoted a perceived religious obligation for all Muslims to travel to ISIS's self-declared "caliphate" in Syria and Iraq. Dozens of United States citizens answered the call. Then, in late 2014 and early 2015, ISIS began encouraging their supporters to commit attacks, however they could and against whomever they could, at home. (Attachment C); (Attachment D). This created a significant law enforcement challenge, often called a "short flash to bang," meaning a much shorter window between radicalization and attack.[1]

In May 2015, the Federal Bureau of Investigation (FBI) began looking into Haris Qamar, who used Twitter to support violence on behalf of ISIS.  As the FBI continued to watch his online activity, the FBI saw posts that included, for example:

- On September 16, 2015, from Twitter account with handle @newerajihadi20, Qamar tweeted his prayer that Allah "give strength to the mujahideen to slaughter every single US military officer." (Attachment A).

- On March 15, 2016, Qamar used the Twitter account with the handle @newerajihadi77 to post a photograph containing the media logo for ISIS's media group, and depicting ISIS terrorists trying to tear the heads off of two prisoners of ISIS whose throats had just been slit so deep that they were nearly decapitated.  Qamar tweeted this photograph to another Twitter user stating "lol don't worry we r coming for you heathens." (Attachment B).

---

1 *See, e.g.,* Carrie Johnson, "FBI Says It Thwarted Attempted July 4th Attack," NPR (July 9, 2015), http://www.npr.org/sections/itsallpolitics/2015/07/09/421536209/fbi-says-it-thwarted-attempted-july-4th-attack.

Concerned that Qamar's support of ISIS may go beyond rhetoric, the FBI sent in a Confidential Witness ("CW") to further investigate Qamar. Through the CW, the FBI learned that Qamar had attempted to travel to join ISIS in 2014, and that his best friends, Soufian Amri and Michael Queen, had known about the planned travel.

After the FBI learned in 2015 of Qamar's attempted travel in 2014, the CW tested Qamar's conviction to ISIS's brutal cause by presenting Qamar with the opportunity to support ISIS from home. In response, Qamar was all too willing to fund ISIS through gift cards and take pictures of prominent U.S. sites for use in an ISIS video promoting lone-wolf attacks in the United States. Qamar also told the CW that he knew some of the U.S. military members whose addresses were published online as part of ISIS's "kill list" lived near his (Qamar's) home. He told the CW that undercover police cars were always outside the homes, suggesting that Qamar had even driven by himself.

In an effort to learn more about Qamar's attempted travel to join ISIS and any other means of supporting ISIS, the FBI questioned Amri and Queen separately on June 24, 2016. The agents were hoping to learn, among other things, whether Qamar had been recruited to join ISIS and who those recruiters were; whether Qamar had any connections or points of contact overseas that would help him and others reach ISIS-controlled territory; and whether there was a facilitation network in the United States that was assisting United States citizens' attempts to travel to join ISIS. The FBI hoped that Queen and Amri could answer some of these questions and, in doing so, help it protect against further recruitment of Americans by ISIS. What the FBI got instead were lies.

3

In his interview with the FBI, Amri said that he would tell the FBI if he knew of anyone who voiced support for ISIS, but that he did not know of anyone. Amri said that he did not know anyone who tried to travel for the purpose of joining ISIS. Instead, he said that he knew one person, long ago—a tall, thin, Indian kid—who mentioned traveling for the purpose of joining ISIS. Later that day, FBI agents observed Amri talking to Queen at their business, and then interviewed Queen. Queen said that he did not know of anyone who voiced support for ISIS or posted pro-ISIS materials online. He also mentioned a tall Indian individual, whom he called "Sunite." However, he said that he did not know of anybody who tried to travel overseas for the purpose of joining ISIS.

On June 28, 2016, the CW recorded a conversation between Queen, Qamar, and the CW. In that conversation, Queen told Qamar and the CW about the FBI interviews on June 24, 2016. Queen said the FBI asked if Queen and Amri knew anyone who was going to join ISIS, or otherwise was pro-ISIS. Queen told them, "I don't know, we threw some . . . Hindu dude that we used to know underneath the bus." Queen said, "I'm never going to throw a Muslim underneath the bus to try to do the right thing."

On July 1, 2016, in a conversation with the CW, Amri stated that he had admitted to the FBI he had previously supported ISIS "because with those guys you have to play along with them, you give them a glimpse of honesty, then you shut it. . . ." Amri continued, "[a]fter that I told them now I don't support them."

<u>Argument</u>

The nature and circumstances of the defendant's offense, as well as the need promote general deterrence and respect for the law, warrant a significant jail sentence in this case.

4

In this case, Queen and Amri not only discounted Qamar's gruesome Twitter activity, his love of violent ISIS videos, and his attempt to travel to join ISIS, but also openly lied about it to the FBI. In doing so, they hindered FBI from carrying out its law enforcement mission. Queen and Amri also completely underestimated Qamar's conviction to support ISIS.

When Queen and Amri confessed their lies to the FBI on July 8, 2016, they stated that they thought Qamar was just boasting when he professed his love for violence and told them he planned to travel to join ISIS. But they were wrong. After his failed attempt to travel to join ISIS, Qamar went on to purchase gift cards to fund ISIS and take photos for use in an ISIS propaganda video calling for lone-wolf attacks. Had Qamar done so with a true ISIS supporter instead of the CW, the results could have been catastrophic. For these reasons, a significant sentence is necessary to reflect the seriousness of the offense, provide general deterrence, and promote the rule of law.

<u>Acceptance of Responsibility</u>

We agree with the pre-sentence report that Queen does not deserve credit for acceptance of responsibility. In addition to the statements he has made to the probation officer, Queen has also contested factual elements of his guilt.

Application Note 2 of Section 3E1.1 of the USSG states:

> **This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.** Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction**.** In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a

5

challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG § 3E1.1 n. 2 (emphasis added).

Queen's statement to the probation officer aside, the defendants could still have obtained credit for acceptance of responsibility if they had gone to trial *solely* to assert and preserve issues that do not relate to factual guilt, such as whether the eight-year statutory maximum under 18 U.S.C. § 1001 or the terrorism enhancement under USSG § 3A1.4(a) applied to them *as a matter of law*. However, this is not what the defendants did.

Amri and Queen have not accepted the facts that go to factual guilt. Both at trial and in supplemental briefing, the defendants argued against the fact that ISIS is a terrorist organization, which is the fundamental reason for the United States bringing the case.[2] Dkt. 73 at 2; Dkt. 74 at 1. Instead, they argued that ISIS might have been a musical group or an Egyptian god, full well knowing that their friend, Haris Qamar, supported and tried to join a terrorist organization.

Amri also argued about the timing of when he was "told" that lying to federal law enforcement was a criminal offense. Dkt. 73 at 16. He argued that the facts do not show how he was told or whether he received the information. *Id.* However, Amri knows from having listened to the interview recordings, which he submitted to the Court for other purposes, that the defendants were both told prior to their interviews that lying to federal law enforcement was a criminal offense.

---

2 Michael Queen endorsed and incorporated Amri's briefing on this issue. Dkt. No. 74.

6

In addition, the defendants argued against the fact that that they conspired to obstruct justice by not mentioning Qamar and instead throwing someone else named "Sunite" under the bus. Amri admits that the facts prove that Amri spoke with the FBI, did not mention Qamar, but did mention an Indian individual. Dkt. 73 at 16-17. The facts further prove that Amri then asked Queen not to mention Qamar to the FBI, and later, Queen did not mention Qamar to the FBI. *Id.* However, Queen and Amri argue that despite this collusion, and despite the fact that neither mentioned Qamar and they both instead mentioned a "tall, thin Indian" individual" to the FBI, Amri and Queen did not conspire to obstruct justice.

Amri even argues that it is possible that there was only one interview on July 24, during which both Queen and Amri were interviewed simultaneously. Dkt. 73 at 17-18. However, the recordings provided in discovery prove the fact that there were two separate interviews of Amri and Queen. Queen further argues that even if he and Amri did enter into an agreement about what to say and not to say to federal law enforcement, that agreement lacked criminal intent. Dkt. 74 at 3. However, that cannot be true, given that the intention of both was to steer the FBI away from Qamar,[3] and both were warned at the beginning of their interviews that lying to federal law enforcement was a criminal offense.

By arguing the non-existence of facts that all parties know to be true, the defendants have disqualified themselves from acceptance of responsibility credit.  They cannot on the one hand claim entitlement to acceptance credit pursuant to Application Note 2, even while contesting the facts of the case.

---

3 Statement of Stipulated Facts as to Soufian Amri, paragraph 31; Statement of Stipulated Facts as to Michael Queen, paragraph 23.

What should preclude the defendants from credit for acceptance of responsibility is not their maintenance of a "not guilty" plea.  What should preclude them from credit for acceptance of responsibility is that they have repeatedly contested the truth of the government's facts. For these reasons, neither Queen nor Amri deserves credit for Acceptance of Responsibility.

Conclusion

Haris Qamar was intent on joining ISIS and committing violence, and his best friends, Michael Queen and Soufian Amri, knew it.  However, they stayed silent at the time and later lied to the FBI. Queen and Amri thought perhaps Qamar was just posturing. But Qamar wasn't just posturing. Instead, after he was prevented from traveling by his parents, Qamar seized upon the opportunity to support ISIS from home. Had the opportunity come from a true ISIS supporter rather than the CW, the results could have been deadly. For all these reasons, only a significant term of imprisonment can promote respect for the law, reflect the seriousness of the offense, and afford adequate deterrence to criminal conduct.

Respectfully submitted,

Dana J. Boente
United States Attorney

_____/s_____
Colleen E. García
Gordon D. Kromberg
Assistant United States Attorneys
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 299-3982 (fax)
Colleen.E.Garcia@usdoj.gov

8

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2017, I electronically filed the foregoing POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

_____/s_____

Colleen E. García
Gordon D. Kromberg
Assistant United States Attorneys
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 299-3982 (fax)
Colleen.E.Garcia@usdoj.gov
