## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Case No. 1:17-CR-50-002 (LMB) |
| ) | |
| v. ) | Sentencing Date: October 13, 2017 |
| ) | |
| **MICHAEL QUEEN** ) | |

### SENTENCING MEMORANDUM

COMES NOW the Defendant, Michael Queen, by and through his counsel, Dontaé L. Bugg, and states his position with regard to sentencing factors, the Government's position on Sentencing, and the presentence report (PSR) prepared herein. On Mr. Queen's behalf, we request that the Court sentence Mr. Queen to probation and no active incarceration. A sentence of probation is sufficient but not greater than necessary in this case and would appropriately consider the over-inflated suggested sentencing guidelines range, the comparative sentence of Haris Qamar, and Mr. Queen's background as a non-violent first-time offender. We also request that should the Court be inclined to sentence Mr. Queen to any period of incarceration, that the Court assign Mr. Queen to a facility as close as possible to his home of Manassas.

### INTRODUCTION

Michael Queen is before the Court for sentencing on Friday, October 13, 2017, for one count of Conspiracy, in violation of 18 U.S.C. § 371 and one count of False Statements in a Matter Involving International Terrorism, in violation of 18 U.S.C. § 1001(a). Mr. Queen was convicted by the Court following a stipulated bench trial. Mr. Queen has fully and completely cooperated with United States Probation Officer Kelly Smihal in the preparation of the PSR. Ultimately, Mr. Queen stands before this Court for sentencing on his two felony convictions.

This prosecution represents the first criminal conviction of any kind and first and only period of incarceration that Mr. Queen has ever faced. For the first time in his life, he faces continued incarceration and being away from his family members that depend on him daily. We request that the Court take into consideration Mr. Queen's background and his conduct in this case thus far, as well as the sentencing event for Haris Qamar when fashioning a sentence for Mr. Queen.

## PSR OBJECTIONS[1]

1. <u>The terrorism enhancement under USSG §3A1.4(a)</u>

As previously stated on the record in this case, both Mr. Queen and Mr. Amri proceeded to a stipulated bench trial because of the terrorism enhancements sought by the Government. Both defendants desired to preserve their ability to appeal the enhancement application.

The burden for showing the enhancement rests with the government. *United States v. Assi*, 586 F. Supp. 2d 841, 847 (E.D. Mich. 2008), *aff'd,* 428 F. App'x 570 (6th Cir. 2011) ("As the Government correctly observes in its sentencing memorandum, it bears the burden of showing by a preponderance of the evidence that the elements of the §3A1.4 enhancement are satisfied here."). In the context of the "obstruction" application note, it is a very difficult burden to meet, and in only one instance nationally has a prosecutor ever sought and obtained the application of the enhancement. *United States v. Benkahla*, 501 F. Supp. 2d 748, 761 (E.D. Va. 2007), *aff'd,* 530 F.3d 300 (4th Cir. 2008) ("before this case, no defendant has ever received an enhancement under § 3A1.4 for obstructing a terrorism investigation."). And *Benkahla* remains the only instance after numerous other failed attempts. *Id.* at 756 ("In *Biheiri III,* the government sought the terrorism

---

[1] Mr. Queen incorporates by reference and restates the most applicable arguments on this issue set for by Co-defendant Mr. Amri in his sentencing memorandum as the defendants are similarly situated.

Page 2 of 12

enhancement in the obstruction context after two previous failed attempts. *See United States v. Biheiri,* 299 F.Supp.2d 590 (E.D.Va.2004); *United States v. Biheiri,* 341 F.Supp.2d 593 (E.D.Va.2004).").  Judge Ellis also rejected it in the third case.

The Court in *Biheiri* concluded that "§3A1.4 applies only where the conduct in issue actually obstructs an investigation of a federal crime of terrorism." *United States v. Biheiri*, 356 F. Supp. 2d 589, 599 (E.D. Va. 2005).  By contrast, the statutes of conviction only require that the statement be false and material, they do not require, and the court did not find, that the statement successfully thwarted an investigation, and no such event happened in this case.  Where the agents have actual awareness of the falsity at the time it occurs, there inherently can be no "actual" obstruction." *Id.* at 600 ("the agents who interviewed Biheiri had actual knowledge that Biheiri's statement regarding his relationship with Marzook was false . . .thus Biheiri's false statements caused no actual obstruction of their terrorism financing investigation.").  In this case, the pretrial discovery clearly establishes that the government was aware as early as 2015 of Qamar's attempted and failed travel to ISIS in 2014.  As such, there was no actual obstruction in this case.  And when agents questioned Qamar after his arrest, they showed him the relevant flight reservation with his email and phone number, establishing that they were even knowledgeable of the specific flight at issue.

The fact that there was no actual obstruction is further cemented by the fact that merely two weeks after Queen and Amri's initial false statements, on the date of Qamar's arrest, agents returned to re-interrogate Queen, this time they asked specifically about Qamar, and Queen told the agents what he knew.  Amri did the same.  Even Qamar reported his conduct to agents at the time of his arrest, with the reports reflecting that he "first told Mike and Soufian about his plan to travel to join Dawlah at the gazebo outside Seoul PC.  They didn't expect to hear what they were

hearing when he told them, they were just frozen. They said Qamar was a 'fucking idiot' when they [sic] told him [sic]. Qamar said they are his best friends. Soufian is trying to do a granite business and is trying to get Qamar to buy into it so Soufian can help Qamar out."

Further support for the inapplicability of the enhancement is found in Judge Ellis' opinion comparing the general obstruction provision with the terrorism obstruction provision. Judge Ellis noted that "the general obstruction-of-justice Sentencing Guideline, provides for a comparatively modest two-level enhancement." *Id.* at 598. That provision has the lesser requirement that the government need only show *either* that the defendant "willfully obstructed or impeded, *or attempted to obstruct or impede*." *Id.* (emphasis in original). The fact that the 2 level enhancement has lower requirements is logical in light of the difference between a two level and a 17 level enhancement. Additionally, the Court noted in *Biheiri* that even under lesser standards required by the two level enhancement, there must be "a materially false statement to a law enforcement officer that *significantly obstructed* or impeded the official investigation." *Id.* at 599, n.14. Finally, the Court agreed that "assuming *arguendo* that § 3A1.4 were deemed ambiguous in this respect, then, to be sure, the rule of lenity would apply as it is now settled that Sentencing Guideline factors are essentially elements of the crime." *Id.* at 599, n. 15.

In the one and only case in which the government has obtained the application of the enhancement, the defendant did successfully and significantly obstruct the investigation, even after he was given an opportunity to come clean. *United States v. Benkahla*, 501 F. Supp. 2d 748, 757 (E.D. Va. 2007), *aff'd,* 530 F.3d 300 (4th Cir. 2008) ("because of Defendant's false or intentionally misleading answers, the Government ***still does not*** know the identity or whereabouts of the persons about whom Defendant was questioned, their involvement with Lashkar-e-Taiba, and their role in aiding persons to obtain jihad training. Since Defendant gave false and misleading answers in the

investigation, and the Government did not, and in some cases, ***still does not***, possess the specific information which it sought, the Court concludes that Defendant actually obstructed the FBI's investigation.") (emphasis added). Indeed, the defendant in that case was so committed to persisting in his obstruction that he was convicted of committing *perjury, twice*, and also lied to the FBI in order to hide the information, and was convicted of that as well. That is the type of "significant obstruction" which Judge Ellis and Judge Cacheris indicated would be necessary. And that makes sense, because it would be devoid of logic to suggest that if the FBI wasted 30 minutes due to a false statement, the defendant should go to jail for 20 years, but if they wasted no minutes, then it should be 2 years. Obviously that makes no sense, and the drafters of the guidelines could not have and did not intend absurd results of that type. *Benkahla* is the only case in which the enhancement has been applied for good reason, and it would be inappropriate to extend the application of the enhancement to the instant case, in which the relevant facts are closer to those of *Biheiri*.

As a last point, the scienter requirement is also unmet as the application is established only where "the defendant knew he was lying about facts relevant to an investigation of a federal crime of terrorism." *United States v. Biheiri*, 356 F. Supp. 2d 589, 599 (E.D. Va. 2005) (citing *United States v. Maflahi,* No. 03-CR-412 (E.D.N.Y. July 9, 2004)). As set forth in *United States v. Benkahla*, 501 F. Supp. 2d 748, 752 (E.D. Va. 2007), "[t]he definition of a 'federal crime of terrorism' limits the enhancement's application to specific investigations." Therefore, the defendant must "know" that his false statements are obstructing a "specific investigation." However, at the time the false statement was made, Queen was in part being questioned about his own Facebook post, and he was unaware there was an investigation occurring into Qamar, or that a mere attempt to travel two years earlier would or could constitute a criminal

offense. He was only forewarned by Amri to be carefully what he said about Qamar. Therefore, although his false statement may have in fact related to a specific investigation, Queen was unaware of that specific investigation, and his lack of the requisite scienter requirement is yet another reason why the enhancement fails to apply in this case.

    2. <u>Acceptance of Responsibility</u>

The defense believes the acceptance of responsibility departure applies under the unusual nature of this case. The commentary to the guidelines, note 2, states that "in each such instance, however, a determination that a defendant has accepted responsibility will be based <u>primarily</u> upon pre-trial statements and conduct." With respect to pre-trial statements alone, the government would acknowledge that the defendant would qualify because his pre-trial statements, like with a statements of facts under a plea of guilt, were sufficient to establish the offenses of conviction. And with respect to pretrial conduct, both defendants offered to plead guilty, even to multiple felonies, but wanted to preserve appellate rights with respect to the applicability of the statutory and sentencing guidelines terrorism enhancements, because of a concern that they do not apply as a matter of law to the uncontroverted facts of the case. Had the defendants been able to preserve such appellate rights on these legal questions, there would have been no trial.

    The probation officer takes the position that Mr. Queen's statements during the PSR interview contradict the Statement of Stipulated Facts he agreed to prior to trial. We respectfully disagree. Mr. Queen does not deny that his statements to the agents during his first interview were untruthful. He does maintain that if the agents asked him specifically about Qamar, he would have told them what he knew. Mr. Queen was in the unique position of also personally being a subject of the agents' inquiry because of a Facebook post that he made days earlier that merely mentioned ISIS. It is now clear that Qamar was the agents' primary reason for interviewing Mr. Queen and

that his Facebook post was not of much concern.  Mr. Queen also told the probation officer that it was difficult to handle knowing someone for 6 years and then finding out crazy stuff about them.  This statement accurately reflects how Mr. Queen has been impacted by this entire situation.  Mr. Queen had limited knowledge about Qamar's failed travel attempt in 2014.  As this matter has progressed, he has come to learn of the depth of Qamar's attempts to aid ISIS and that information still has him questioning just how much he did not know about his former friend.  The Court should not take this statement as an indication that he does not accept responsibility in this matter.  The remaining statements quoted by the probation officer that Mr. Queen "does not condone terrorism" and he is a "normal guy who wakes up, goes to work, then goes home and plays video games" are both true statements and do not contradict the agreed Statement of Stipulated Facts.

      The government asserts that the oral and written arguments of counsel should preclude the defendants from receiving credit for acceptance of responsibility.  As an initial matter, these were the arguments made by counsel, the defendants themselves were not aware of the specific arguments which would be made orally or in writing.  Secondly, these are not the types of "false denials" of facts prohibited by the guideline application note 1(A).  Defense counsel did not "falsely deny" any fact.  The defense stipulated to every evidentiary fact in this case.  No witnesses were cross examined, no credibility was tested, and no trial evidence was stated to be, or even suggested to be, false.  Rather, counsel made the *legal argument* that the evidence submitted was legally insufficient to prove the charged offenses.  There is an important distinction between saying that "the ISIS in this case is not a terrorist organization" and "the government has failed to adduce sufficient evidence that the ISIS in this case is a terrorist organization."  The former is a *false* denial, the latter is simply a legal argument, because legal argument inherently cannot contain false statements, but at most an erroneous legal argument.

At closing argument, defense counsel has an ethical obligation to make all non-frivolous arguments with respect to the offenses at issue, and the arguments made were made consistent with the ethical obligations of counsel. And the guidelines themselves suggest that the arguments of counsel should be given little if any weight, because, what matters most is the pre-trial statements and conduct, and here, those statements and conduct, had defense counsel made no closing argument, would clearly entitle the defendant to acceptance of responsibility credit. As such, the court should apply this departure, and reduce the defendant's offense level accordingly.

## HISTORY AND CHARACTERISTICS FO MR. QUEEN

As noted in the PSR, Mr. Queen is a 28-year-old man with no prior criminal record. He is the only child born to his parents that were never married. Mr. Queen had very little interaction with his biological father before his passing in 2008 or 2009. His mother raised his as a single parent and over time he spent more and more time in the care of his babysitter/Godmother, Tatiana Valdivia. Eventually, Mr. Queen moved in with Ms. Valdivia and has resided with her and her boyfriend, Thomas Thayer, for the past 10 years. Both Ms. Valdivia and Mr. Thayer suffer from several medical conditions that require frequent doctor visits. Mr. Queen is responsible daily for getting them both to and from their various appointments and to complete other regular errands. In fact, one of Mr. Queen's primary questions regarding his sentencing event was whether he would immediately be taken into custody because his family members would have no way back home.

Since early 2014, Mr. Queen has owned and operated the Cave Gaming Center in Fairfax, Virginia. The Cave is owned and operated by Mr. Queen, his co-defendant Mr. Amri and four other individuals. As noted in the letter of support (Attachment 1) submitted by Kayla Merino, Mr. Queen is the only person that is able and available to work the night shift at the 24-hour gaming

center. Mr. Queen is single and does not have any children. When he is not caring for his Godmother and her boyfriend, he is working in his business or at home playing video games.

Admittedly, Mr. Queen made a bad decision by not being immediately forthcoming with the agents regarding Qamar; however, his likelihood of recidivism appears to be extremely low.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

Without minimizing the importance of combating international terrorism, Mr. Queen's same actions if the agents were present to investigate a financial crime would have likely resulted in a 0-6-month guideline range. Unlike Mr. Qamar, who was for several years, actively trying to join and provide material support to Isis, Mr. Queen is before this Court because he was untruthful about one aspect of Mr. Qamar's many evil deeds. It is important to be mindful that at the time of Mr. Queen's interview, the agents were fully aware of Qamar's failed travel attempt in 2014. In fact, Qamar himself told the government's cooperating witness about his travel plans in September 2015. According to the Statement of facts agreed upon by the government in Qamar's case, Qamar continued to provided details regarding his attempted travel and further desire to travel to the cooperating witness throughout the remainder of 2015 and into 2016. Also, prior to the interviews of Mr. Queen and Mr. Amri, the FBI has Qama caught red-headed in overt acts of buying multiple gift cards and taking photos of various landmarks in the DC metro area. It is hard to imagine how Mr. Queen's limited knowledge about the failed 2014 travel plans would have assisted or aided the government's investigation in any meaningful manner.

### CONCLUSION

Clearly, the actions of Michael Queen were against not only his own interests, but as well, and perhaps more importantly, against those of the community and ultimately, his family members that depend on him daily. Mr. Queen's actions during his two interviews with agents demonstrate

poor judgment, which has now caused him to jeopardize his future and that of his family. It only makes it worse for him that this entire ordeal could have easily been avoided. Mr. Queen was evasive and untruthful about limited knowledge he had about a person that he considered a friend. He now regrets daily taking any effort to minimize what he knew about Qamar given his current understanding of just how disturbed and violent Qamar was.

Section 3553 (a)(2)(A), which directs this Court to consider "the need for the sentence imposed… to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," counsels in favor of a variance.

For an individual such as Mr. Queen who has never been convicted of any offense, a stranger prior to this sentencing event to the criminal justice system, a sentence of probation and the certainty of active incarceration for any probation violation will leave a lasting impression upon the individual such that individual deterrence is achieved. With respect to community deterrence, multiple felony convictions and a reasonable period of incarceration achieves the same. A lengthy period of incarnation may serve to deter other from speaking with or cooperating at all with investigating agents for fear of facing a false statements prosecution.

For the reasons set forth above and those that may be presented orally at the sentencing hearing, Mr. Queen requests that this Court impose a sentence of probation with any terms that the Court deems appropriate. Such a sentence is sufficient <u>but not greater than necessary</u> to accomplish the purposes of sentencing set forth in 18 U.S.C. §3553(a).

                                                                     Respectfully Submitted,
                                                                     **MICHAEL QUEEN**
                                                                     By Counsel

               /s/
Dontaé L. Bugg, Esq. (VSB #74042)
Bugg Law Firm, PLLC
Attorney for Michael Queen
4103 Chain Bridge Road, Suite 401
Fairfax, VA 22030
Phone: 703-591-4507
Facsimile: 703-991-8307
E-mail: dbugg@bugglawfirm.com

## CERTIFICATE OF ELECTRONIC FILING

   I HEREBY CERTIFY THAT on October 10, 2017 I filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to the following:

Assistant U.S. Attorney
Gordon D. Kromberg, Esquire
Colleen E. Garcia, Esquire
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
gordon.kromberg@usdoj.gov
collen.e.garcia@usdoj.gov


     /s/
Dontaé L. Bugg, Esq. (VSB #74042)
Bugg Law Firm, PLLC
Attorney for Michael Queen
4103 Chain Bridge Road, Suite 401
Fairfax, VA 22030
Phone: 703-591-4507
Facsimile: 703-991-8307
E-mail: dbugg@bugglawfirm.com